UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

JUDITH GRIGAL,                                       Civil No. 05-2956 (MJD/FLN)

            Plaintiff,

v.

JO ANNE B. BARNHART,                         **REPORT AND RECOMMENDATION**
Commissioner of Social Security,

            Defendant.

_____

Lionel Peabody, Esq., for Plaintiff.
Lonnie F. Bryan, Assistant United States Attorney, for the Government.

_____

      Plaintiff Judith Grigal seeks judicial review of the final decision of the Commissioner of

Social Security ("Commissioner"), who denied her application for a period of disability and

disability insurance benefits. See 42 U.S.C. § 416(i); 42 U.S.C. § 423.  This Court has appellate

jurisdiction over the claim pursuant to 42 U.S.C. § 405 (g).  This matter was referred to the

undersigned United States Magistrate Judge for Report and Recommendation pursuant to 28 U.S.C.

§ 636 and Local Rule 72.1.  The parties have submitted cross-motions for summary judgment [#8

and #12].  In addition, Plaintiff filed a motion for remand for consideration of new and material

evidence [#16].  For the reasons set forth below, it is the Court's recommendation that Plaintiff's

motion for remand for consideration of new and material evidence [#16] be denied, that the

Commissioner's decision be reversed and that the case be remanded to the Commissioner for further

proceedings consistent with this Report and Recommendation.

## I.   INTRODUCTION

      Plaintiff Judith Grigal filed an application for a period of disability and disability insurance

benefits ("DIB") on December 18, 2002, alleging a disability onset date of October 4, 2002.  (Tr. at 61-64.)  On May 29, 2003, a Notice of Disapproved Claim was issued regarding her application.  (Tr. at 29-33.)  Plaintiff filed a request for reconsideration on July 1, 2003, and that request was denied on July 29, 2003.  (Tr. at 39-43.)  Plaintiff filed a request for a hearing by an Administrative Law Judge (hereinafter "ALJ") on September 8, 2003.  (Tr. at 44-45.)  ALJ Larry Meuwissen conducted a hearing on this matter on June 9, 2004.  (Tr. at 414-442.)  On August 17, 2004, ALJ Meuwissen issued an unfavorable decision and Plaintiff made a timely request for review.  (Tr. at 7-9; 19-33.)  On May 10, 2005, the Appeals Council denied Plaintiff's Request for Review, making the ALJ's decision the final decision of the Commissioner.  (Tr. at 7-9.)

Plaintiff initiated judicial review of this action on December 22, 2005.  (Docket No. 1.) Plaintiff filed her motion for summary judgment on April 28, 2006, and the Commissioner filed its motion for summary judgment on June 9, 2006.  (Docket Nos. 8 and 12.)  On June 22, 2006, Plaintiff filed a motion for remand for consideration of new and material evidence.  (Docket Number 16.) Plaintiff argues that the Court should admit new evidence into the record because it is material and there was good cause for the failure to incorporate this evidence into the prior record.

In her motion for summary judgment Plaintiff argues that the ALJ committed four errors in the present case.  First, Plaintiff argues that the ALJ failed to give the opinions of Dr. LaKosky, her treating psychiatrist, appropriate weight.  Second, Plaintiff argues that the ALJ's findings regarding Plaintiff's mental and physical residual functional capacity are not supported by substantial evidence on the record as a whole.  Third, Plaintiff argues that the ALJ's credibility finding is not supported by substantial evidence on the record as a whole.  Finally, Plaintiff argues that the record of the hearing is inadequate and insufficient to sustain the ALJ's decision.  Defendant argues that the

ALJ's findings are supported by substantial evidence on the record as a whole, and should be affirmed.

## II.  STATEMENT OF FACTS

### A.    Background

Plaintiff was born on April 5, 1949, and was 55 years old at the time of the hearing on this matter, making her a "person of advanced age."  (Tr. at 418.)  See 20 C.F.R. § 404.1563 (age categories defined).  Plaintiff possesses a certificate as a licensed practical nurse and a Bachelor of Science degree in general science.  (Tr. at 420.)  Plaintiff testified that she lives in her own home with her husband.  (Tr. at 424.)  Plaintiff has performed past relevant work as a social worker.  (Tr. at 16.)  Plaintiff suffers from an anxiety disorder, major depressive disorder, a seizure disorder and "carpal tunnel syndrome bilaterally status post releases and right ulnar transposition."  (Tr. at 18.)  In addition, evidence was presented that Plaintiff suffers from migraines and fibromyalgia.  (Tr. at 225; 394-95; 412; 422-23.)

### B.    Medical Evidence

#### 1.    Medical Evidence of Physical Impairments

On September 5, 1997, Plaintiff complained of muscle tenderness to Dr. Brian Pfeifer.  (Tr. at 243.)  Dr. Pfeifer noted that Plaintiff had "some point tenderness" that "seemed to be paired in a general pattern of fibromyalgia." (Tr. at 243.)  Plaintiff was referred to physical therapy on August 4, 1999, to treat her fibromyalgia.  (Tr. at 225.)  On December 6, 2000, Plaintiff was again prescribed a course of physical therapy to treat her fibromyalgia.  (Tr. at 206.)[1]  On May 26, 2001,

---

[1] It is unclear from the record whether Plaintiff ever completed either course of physical therapy prescribed to treat her fibromyalgia.

Plaintiff was seen at the Duluth Clinic in Virginia, Minnesota, complaining of "fibromyalgia pain, especially the right arm and shoulder." (Tr. at 202.) Plaintiff was prescribed Flexeril and Naproxen for her fibromyalgia pain. (Tr. at 202.) On June 5, 2001, during a physical examination, Plaintiff described her fibromyalgia, as "aching muscles." (Tr. at 198.) On January 10, 2002, Plaintiff was seen for "generalized aches and pain. Most likely secondary to muscloskeletal . . . fibromyalgia." (Tr. at 370.) Plaintiff was prescribed Naproxen. (Tr. at 370.) On February 28, 2002, Linda Ramsey, PA-C of the Duluth Clinic in Virginia wrote to the Range Mental Health Center and noted that Plaintiff had been diagnosed with fibromyalgia and migraines, among other health problems. (Tr. at 366.)

On October 24, 2002, Plaintiff was admitted into the hospital after her husband found her "lying unresponsive on the floor . . . and her legs were shaking." (Tr. at 270.) Plaintiff's husband reported that Plaintiff was in this state for approximately eight minutes and that Plaintiff woke from this experience with a severe headache. (Tr. at 270.) Plaintiff was diagnosed with a first time seizure and was discharged the next day. (Tr. at 275.)

On January 9, 2003, Plaintiff completed an activities of daily living questionnaire. (Tr. at 102-107.) Plaintiff stated that she had been experiencing problems with her hands for about one year. (Tr. at 107.) Plaintiff stated that when she is under pressure she often experiences a migraine or needs to lie down and rest during the day. (Tr. at 106.) Plaintiff noted that she spends ten hours a day sleeping and that she tried to attend a painting class in the fall but she was unable to regularly attend the class once a week. (Tr. at 105.) Plaintiff stated that she cooks, cleans, reads, watches television, grooms herself and talks on the phone daily. (Tr. at 105.)

On January 20, 2003, Plaintiff was diagnosed with severe bilateral carpal tunnel syndrome.

4

(Tr. at 278.)  In addition, Plaintiff was also diagnosed with a mild ulnar neuropathy at the right elbow.  (Tr. at 278.)  Plaintiff was referred for surgery to correct these problems.  (Tr. at 278.)  On February 21, 2003, Plaintiff underwent a left open carpal tunnel release, which was performed by Dr. Robin Hendricks, an orthopedic surgeon.  (Tr. at 264.)

On March 8, 2003, Plaintiff's medical record was evaluated by Mario Zarama, M.D. to determine Plaintiff's physical residual functional capacity.  (Tr. at 292-99.)  Dr. Zarama noted that no exertional, postural, manipulative, visual or communicative limitations had been established.  (Tr. at 293-96.)  Dr. Zarama noted that Plaintiff had one environmental limitation, in that she should avoid all exposure to hazards, e.g., machinery or heights.  (Tr. at 296.)

On March 11, 2003, Plaintiff was seen by Dr. Hendricks to review her status two weeks after the left open carpal tunnel release surgery.  (Tr. at 305.)  Dr. Hendricks noted that Plaintiff had full range of motion in all of her fingers on her left hand.  (Tr. at 305.)  Dr. Hendricks fitted Plaintiff for a volar wrist splint and instructed her to wear the splint for two weeks when lifting anything over ten pounds.  (Tr. at 305.)  Dr. Hendricks recommended that Plaintiff return to activities without restriction after two weeks, as long as she could tolerate it.  (Tr. at 305.)

On May 20, 2003, Plaintiff underwent a right open carpal tunnel release and a right subcutaneous ulnar nerve transposition, which was performed by Dr. Hendricks.  (Tr. at 306.)  On June 3, 2003, Plaintiff was seen by Dr. Hendricks for a two week follow-up after her surgery.  (Tr. at 305.)  Dr. Hendricks noted that Plaintiff was "doing very well" and that Plaintiff had noticed "a slight improvement in terms of the numbness that she has had long-term."  (Tr. at 305.)  Dr. Hendricks noted that there was "[v]ery minimal swelling at the wrist or the elbow [and that Plaintiff] ha[d] full [range of motion]."  (Tr. at 305.)  Dr. Hendricks ordered Plaintiff to continue physical

therapy and return to see her in one month, and opined that "[s]he should be near 100 percent at that time." (Tr. at 305.) Plaintiff participated in some physical therapy after this surgery; however, Plaintiff discontinued physical therapy on June 26, 2003. (Tr. at 309.)

On July 26, 2003, a second residual functional capacity assessment was conducted by Alan Suddard, M.D., regarding Plaintiff's physical impairments. (Tr. at 337-44.) Dr. Suddard determined that Plaintiff could lift 50 pounds occasionally, 25 pounds frequently, could stand or walk with normal breaks for a total of about six hours in an eight hour day and sit for about six hours in an eight hour day. (Tr. at 338.) Dr. Suddard did not fill out the portion of the form devoted to postural limitations. (Tr. at 340.) Dr. Suddard opined that Plaintiff had an unlimited ability to reach in all directions (including overhead) and was not limited in "feeling (skin receptors)." (Tr. at 340.) Dr. Suddard opined that Plaintiff was limited in her right hand as far as "fingering (fine manipulation)" and that Plaintiff was restricted from using a power grip on her right hand. (Tr. at 340.) Dr. Suddard opined that Plaintiff did not possess any visual or communicative limitations, and that, aside from avoiding all exposure to "hazards (machinery, heights, etc.)" Plaintiff was unlimited in her environmental limitations as well. (Tr. at 341.) Dr. Suddard noted that there was no treating or examining source statement on file regarding Plaintiff's physical capacity. (Tr. at 343.)

## 2. Medical Evidence of Mental Impairments

Plaintiff was hospitalized in May 1997 for a psychotic break down. (Tr. at 181.) On August 8, 1997, when she was seen for her three month, fifteen minute medication review by her psychiatrist, Dr. Randall LaKosky, Plaintiff was slowly improving from her condition when she was hospitalized. (Tr. at 181.) Dr. LaKosky stated that Plaintiff seemed to be "in a good remission of her brief psychotic reaction." (Tr. at 181.) Plaintiff continued to see Dr. LaKosky at three month

intervals for medication reviews.  On January 19, 1998, Dr. LaKosky met with Plaintiff for a fifteen minute medication review, and noted that Plaintiff was "in a good remission of her chronic depression, panic disorder, and psychosis." (Tr. at 180.)  On April 14, 1998, Plaintiff was seen by Dr. LaKosky who stated that she looked good and was not reporting any side effects from her medications.  (Tr. at 179.)  On July 24, 1998, Dr. LaKosky noted that Plaintiff was "doing quite well" but that Plaintiff told him that "she has a couple of bad periods now and then, one earlier this month when she requested and was put back on Risperdal because she felt she was getting some psychotic symptoms." (Tr. at 178.)  Dr. LaKosky noted at that time that Plaintiff was "significantly improved."  (Tr. at 178.)

On October 26, 1998, Dr. LaKosky noted that Plaintiff stopped taking Paxil and Pamelor, that she experienced increased anxiety and depression as a result but that she was "maintaining a reasonable remission since stopping the Paxil and Pamelor." (Tr. at 177.)  On January 7, 1999, Dr. LaKosky noted that Plaintiff was "in a moderate remission of her chronic panic disorder and psychosis."  (Tr. at 176.)  On April 6, 1999, Dr. LaKosky noted that Plaintiff was "in a good remission of her chronic depressive psychosis and panic disorder." (Tr. at 175.)  Dr. LaKosky recommended that Plaintiff continue her usage of Klonopin, Risperdal, Paxil, and Pamelor and that she decrease her use of Cytomel. (Tr. at 175.) Dr. LaKosky ordered Plaintiff to continue these same medications on July 2, 1999, and noted that Plaintiff was "in a good remission of her mental illness." (Tr. at 174.)

On October 8, 1999, Dr. LaKosky noted that Plaintiff "was not as good as she was three months ago."  (Tr. at 173.)  In addition to the previously mentioned medications, Dr. LaKosky prescribed Fiorinal for Plaintiff's migraine headaches.  (Tr. at 173.)  On January 7, 2000, Dr.

LaKosky noted that Plaintiff was again "in a good remission of her Panic Disorder, Depression and psychosis" and he did not recommend any medication changes.  (Tr. at 172.)  On April 28, 2000, Dr. LaKosky noted that Plaintiff was "a bit more depressed these days" and he recommended that she "try cautiously to cut back on the Pamelor."  (Tr. at 171.)  On August 4, 2000, Dr. LaKosky opined that Plaintiff was "in a good remission of her depressive psychosis and panic."  (Tr. at 170.) Dr. LaKosky discontinued use of Paxil and started Plaintiff on Celexa.  (Tr. at 170.)

Dr. LaKosky switched Plaintiff from Risperdal to Seroquel on November 14, 2000, because the Risperdal was causing Plaintiff to gain weight.  (Tr. at 169.)  Dr. LaKosky also recommended that Plaintiff continue taking Imitrex for her migraines.  (Tr. at 169.)  Dr. LaKosky opined at the time that Plaintiff was "in a moderate remission of her psychosis and panic disorder."  (Tr. at 169.) On February 13, 2001, Dr. LaKosky opined that Plaintiff was "in reasonably good remission of her panic disorder, depression, and occasional psychosis."  (Tr. at 168.)  On May 3, 2001, Dr. LaKosky opined that Plaintiff was "in a reasonably good remission of her depressive psychosis.  (Tr. at 167.) On August 9, 2001, Dr. LaKosky opined that Plaintiff was "in a good remission of her mental illness" and Dr. LaKosky recommended continuing the same medications that she had been taking since November 14, 2000.  (Tr. at 166.)  On November 13, 2001, Dr. LaKosky opined that Plaintiff was "in a near total remission of her psychosis and panic disorder."  (Tr. at 165.)

On February 13, 2002, Plaintiff was seen by Dr. LaKosky for another fifteen minute medication review.  (Tr. at 401.)  Dr. LaKosky opined that Plaintiff was "in a near total remission of her depression and anxiety disorder." (Tr. at 401.) Dr. LaKosky continued to prescribe Klonopin, Pamelor, Cytomel, Fiorinal, Seroquel and Celexa for Plaintiff.  (Tr. at 401.)

On June 3, 2002, Dr. LaKosky reviewed Plaintiff's medications and determined that

Plaintiff's medications were sufficient.  (Tr. at 400.)  Dr. LaKosky opined that Plaintiff was "in a

good remission of her depression and panic disorder."  (Tr. at 400.)  However, the notes from

September 18, 2002, state

> Judith was seen for a one month, 15 minute med review . . . She is still having
> trouble with the depression.  Her thinking is not real well.  Her marriage is going
> well, but she seems overwhelmed by work.  I got a form from her that I will fill out
> stating that she is disabled and shouldn't work for at least a year, if not longer.

(Tr. at 399.)  Dr. LaKosky opined that Plaintiff "was not doing well with her depression and

psychotic symptoms" however, the only change made to Plaintiff's medication from June 3, 2002,

was to decrease the dosage of Pamelor from 35 milligrams to 25 milligrams and to order that

Plaintiff continue to use Imitrex "50 mg. t.i.d. PRN."  (Tr. at 399.)  Plaintiff applied for and received

disability from the Public Employees Retirement Association ("PERA") in December 2002.  The

next medication review conducted by Dr. LaKosky that is in the record is for July 21, 2003.  (Tr.

at 398.)

On March 3, 2003, Plaintiff was examined by Dr. Jonathan Speare, Ph.D, L.P.  (Tr. at 284-

91.)  Plaintiff told Dr. Speare that when she was hospitalized in October 2002 she "was seeing blood

on her bed and thought that her room was bugged."  (Tr. at 285.)  Dr. Speare noted that

> Accompanying the referral were four medication management consultation notes
> signed by Randall LaKosky, M.D., psychiatrist at the Range Mental Health Center.
> In these apparently routine medication reviews, Dr. LaKosky appears to believe that
> [Plaintiff] is doing well with her psychosis, panic disorder and depression in
> November 12, 2001, three months later saying essentially the same thing, four
> months later, noting the same thing, and 3 months after that, saying that she is not
> doing well with her depression and psychotic symptoms and noting that she seemed
> overwhelmed by work, stating his intention to fill out a form stating that she is
> disabled and shouldn't work for at least a year, if not longer.  There is little
> documentation of her symptoms anywhere in the materials sent, and what little
> information there is appears to contradict Dr. LaKosky's conclusions.

(Tr. at 285.)  Dr. Speare noted that Plaintiff "appeared to have impaired concentration abilities,

being only able to repeat 5 digits forwards and 3 digits backwards, and when asked to subtract 7's

serially from 100, she was only able to perform two calculations, making one error, and quitting at

25 seconds, saying she couldn't do it."  (Tr. at 288.)

Dr. Speare noted that "[i]n the interview, [Plaintiff] did not specifically admit to current

symptoms which would support a diagnosis of major depression . . . so it would appear that the

condition is in at least partial remission."  (Tr. at 289.)  Dr. Speare stated that Plaintiff

> appears to be a person with a 15 year history of major depression, going through
> cycles of remission and exacerbation, generally well controlled through medications,
> except when she is under stress, such as she experienced last fall with the new co-
> worker to whom she could not adjust.  When she is in remission, as she generally
> appeared to be during this interview, it is unlikely that most people would be able to
> notice any abnormal functioning, but under stress, it would appear that she would
> again become more psychotic and her work performance would severely deteriorate.
> The prognosis for recovery from the disorder seems poor.

(Tr. at 290.)  Dr. Speare opined that Plaintiff suffered from "Major depressive disorder, recurrent,

in partial remission" and "anxiety disorder not otherwise specified."  (Tr. at 290.)  Dr. Speare noted

that while Plaintiff states that she suffers from a panic disorder, "she has only had one in the last six

months and she was quite vague about symptoms that she experiences, so it appears to be adequately

controlled by the medications she has been prescribed."  (Tr. at 289.)  Dr. Speare opined that

Plaintiff's Global Assessment of Functioning (hereinafter "GAF") score was 40[2].  (Tr. at 290.)

Dr. Speare concluded that

[a]lthough [Plaintiff's] functioning at this point appears to be only minimally

---

[2] A score of 31-40 on the Global Assessment of Functioning Scale means that the patient
suffers "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical,
obscure, or irrelevant) OR major impairment in several areas, such as work or school, family
relations, judgment, thinking or mood (e.g., depressed man avoids friends, neglects family, and
is unable to work . . . ) DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th
Ed.1994)

impaired, as evidenced by some possibly paranoid thinking and difficulties concentrating, her history suggests that she would be severely impaired in her ability to tolerate the stress and pressure typically found in an entry level work place. Although currently she is showing only minimal interference with her capacity to sustain attention and concentration, it is likely that under stress this would become severe, which would similarly cause a like impairment in understanding, remembering, and following instructions and in her ability to carry out work-like tasks with reasonable persistence and pace. Her ability to respond appropriately to brief and superficial contact with co-workers and supervisors is demonstrably impaired, which she appears to cope with by having removed herself from the work place and having minimal social interactions with others besides her husband, but it would seem likely that having to interact with the public or co-workers would be quite stressful to her and significantly impair her functioning.

(Tr. at 290-91.)

On May 15, 2003, a mental residual functional capacity assessment was completed on Plaintiff by Martin Koretzky, Ph.D. (Tr. at 317-22.) In Dr. Koretzky's opinion, Plaintiff is not significantly limited in the areas of understanding and memory. (Tr. at 317.) When asked about sustained concentration and persistence, Dr. Koretzky opined that Plaintiff was moderately limited in her "ability to maintain attention and concentration for extended periods," and her "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. at 317-18.) Dr. Koretzky opined that Plaintiff was moderately limited in her "ability to interact appropriately with the general public," her "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes," and her "ability to respond appropriately to changes in the work setting." (Tr. at 318.) Dr. Koretzky concluded that Plaintiff's understanding and memory were not significantly limited. (Tr. at 322.) Dr. Koretzky concluded that Plaintiff "would have minimal limitations maintain [sic] attention and concentration and completing a workweek at a consistent pace." (Tr. at 322.) Dr. Koretzky opined that Plaintiff would "have less

than substantial limitations interacting with the public . . . minimal limitations getting along with coworkers" and "minimal limitations adapting to changes."  (Tr. at 322.)  These findings were reviewed and affirmed by Dr. Koretzky on July 25, 2003.  (Tr. at 319.)

Dr. Koretzky also filled out a Psychiatric Review Technique form on May 15, 2003 and reaffirmed the opinions on that form on July 25, 2003.  (Tr. at 323.)  Dr. Koretzy determined that Plaintiff suffered from major depressive disorder, in partial remission and "anxiety disorder NOS." (Tr. at 323.)  Dr. Koretzky opined that, based on these two mental disorders, Plaintiff was not restricted in her activities of daily living, had mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and had experienced one or two episodes of decompensation, each of an extended duration.  (Tr. at 333.)  Dr. Koretzy concluded that the evidence he reviewed in Plaintiff's medical file did not establish the presence of the "C" criteria for Listing 12.04 or 12.06.  (Tr. at 334.)

The next medication review conducted by Dr. LaKosky that is in the record is for July 21, 2003, and Dr. LaKosky stated that Plaintiff was "in a good remission of her depressive psychosis." (Tr. at 398.)  At that time Dr. LaKosky was no longer prescribing Pamelor for Plaintiff; otherwise, her medications remained the same as those prescribed to her on September 18, 2002.  (Tr. at 398.)

On August 21, 2003, Dr. LaKosky wrote a letter to Plaintiff's supervisor at St. Louis County Social Services.  (Tr. at 396.)  In that letter Dr. LaKosky stated the following:

> Judy's present diagnosis [is] Panic Disorder, Severe, and Major Depression, Recurrent.  The prognosis is difficult since these illnesses are tied partly to her medical condition of fibromyalgia and migraines.  She has, over the years, responded well to the psychotropic medications I have used.  Unfortunately, they do not eliminate a hundred percent of the panic attacks or the total depression partially because of the ongoing stress of her chronic medical conditions and work related stress.

> After again reviewing her job description, I had generally thought in the past that Judith could adequately function in her job. However, Judith's condition continues to decline due to her advancing physical illnesses and increased stressors in her life. It is my general consensus, at this time, that her condition still does not seem to be stabilizing and we are having a difficult time keeping her on an even keel. I have advised Judy to continue her pursuit with filing for disability . . . I am advising Judy to continue her leave of absence for approximately one year.

(Tr. at 396.)  On October 15, 2003, Dr. LaKosky opined that Plaintiff was "in a good remission of her depression and panic disorder" and Dr. LaKosky changed Plaintiff's dosage of Imitrex from 50 milligrams to 15 milligrams.  (Tr. at 398.)  On November 24, 2003, Dr. LaKosky wrote a letter to Plaintiff's first attorney, Mr. Michael Kearney.  (Tr. at 394-95.)  Dr. LaKosky wrote that Plaintiff had been his patient since February, 1992.  (Tr. at 394.)  Dr. LaKosky wrote the following:

> My professional opinion is that she is suffering from Major Depression with Psychotic Features, a Panic Disorder, and severe migraine headaches. Over the years she has slowly gotten worse in spite of rather intensive treatment. I have had her on up to six psychotropic meds, two of them for the migraine headaches, the others for the depression, panic, and psychotic mentation she exhibits from time to time. She seemed to slowly get worse until in 2002, her condition had deteriorated to the point where I recommended she go on a medical for at least a year to see if she could improve enough to work again. Over the course of that year she has had somewhat of an up and down course, but never reached a place where I thought she could return to work. The mental illness she suffers from seems to absorb too much of her thinking and energy. She has trouble functioning beyond activities of daily living and within the confines of her marriage. She suffers from depression which at times merges into hallucinating and delusional thinking that becomes psychotic. At other times she is suffering from panic disorder and panic attacks. The migraine headaches have been severe enough to require the use of both Imitrex and Fiorinal #3 which contains codeine. Her most current medications include Celexa, Cytomel, Fiorinal, Seroquel (an antipsychotic), Klonopin for anxiety, and Imitrex.
>
> It is my professional opinion that Ms. Grigal is unemployable due to the severity of her mental illness.

(Tr. at 394-95.)

On May 24, 2004, Dr. LaKosky wrote another letter to Attorney Michael Kearney.  (Tr. at 412.)  In that letter Dr. LaKosky stated that he "continued to follow [Plaintiff] and it [wa]s [his]

13

professional opinion that the diagnosis has not changed in her case." (Tr. at 412.) Dr. LaKosky

opined that

> Her mental illness has been severe and persistent leading to her going on medical
> leave last year. In spite of being on above average medication dosages, she has not
> been able to go into a remission of her illness. The severity of her illness is such that
> in my opinion that she is unable to be gainfully employed and has been since
> September/October, 2002.
>
> Her symptoms include depressed affect, feeling overwhelmed, low energy, feeling
> hopeless and helpless. . . . At times the depression gets severe enough so she
> becomes psychotic with confusion, delusions, and even hallucinations. She is
> currently being treated with Celexa, at an above average dose, Seroquel, Cytomel
> (because of a slight decrease in her thyroid), Fiorinal and Imitrex for migraine
> headaches. Her psychiatric state has been a bit better since being off work. She
> remains, however, quite fragile and very easily goes back into a more severe
> depression with psychotic features. She has been tried on several different
> medications over the years, she goes into partial remission, but stress comes along
> and triggers her falling back into the psychotic depression.

(Tr. at 412.)

### C.    Plaintiff's Testimony

Plaintiff testified that she was born on April 5, 1949, is married and has two children above

the age of eighteen. (Tr. at 418-19.) Plaintiff testified that she is certified as a licensed practical

nurse and that she also possesses a Bachelor of Science degree in general science. (Tr. at 420.)

Plaintiff testified that her mental health issues began in 1988 when she experienced a "full-blown

psychotic episode." (Tr. at 425.) Plaintiff testified that she worked in Social Services for 28 years

and that she stopped working because she "could not do the work any longer." (Tr. at 420.)

Plaintiff testified that "[w]ith the mental problems [she] ha[s], [she has] a lot of confusion at times

. . . [and that] there were many days that mentally [she] just could not do the work, the thought

process was not there to enable [her] to do the work that was expected of [her]." (Tr. at 420.)

Plaintiff testified that her employer at Social Services made accommodations for her, allowing her

to come in early and to work on weekends to make up for the time that she missed due to her mental health problems. (Tr. at 426.) Plaintiff testified that, toward the end of her employment, her employer allowed her to take a two hour break in the middle of the day to go home and rest and then come back to work. (Tr. at 427.) Even with these accommodations Plaintiff testified that she was unable to complete her job and she was still absent from work for a significant period of time, missing at least one day of work per week. (Tr. at 427.)

Plaintiff testified that, other than meeting with Dr. Lakosky for fifteen minutes every three months, she was not receiving any psychological counseling. (Tr. at 420.) Plaintiff testified that she was currently taking 40 milligrams of Celexa at night, 25 milligrams of Seroquel, one to six times per day, and one milligram of Klonopin one to three times per day. (Tr. at 421.) Plaintiff testified that she was taking these same medications while she was still working. (Tr. at 421.) Plaintiff testified that "[t]he dosage has had a pattern of going up on the Seroquel and the Klonopin of going up and going down and going up and going down . . . because my mood thing, it swings so much . . . so many ups and downs. Sometimes I don't need very much medication, other times I need a good deal of medication." (Tr. at 421.) Plaintiff testified that she had carpal tunnel surgery on her right and left wrist, as well as her ulnar nerve, and that these surgeries were successful. (Tr. at 422.)

Plaintiff testified that she has a valid drivers license and that she drove herself to the hearing. (Tr. at 419.) Plaintiff testified that she took one trip since November 30, 2001, to visit her husband's family in Pennsylvania. (Tr. at 419.) Plaintiff testified that she typically gets up at 9:00 a.m., unless she has a migraine, and goes to sleep between 10:00 p.m. and 11:00 p.m. (Tr. at 422-23.) Plaintiff testified that during the day she completes household chores, including cleaning, cooking, laundry

and running errands.  (Tr. at 423.)  Plaintiff testified that she keeps in contact with her friends on a

fairly regular basis by using the telephone, and that she and her husband "occasionally" go to the

planetarium or go to a restaurant.  (Tr. at 423.)  Plaintiff testified that she occasionally accompanies

her husband when he goes fishing and that they engage in church related activities from time to time.

(Tr. at 423.)  Plaintiff testified that she does some sewing and also a little bit of gardening.  (Tr. at

423.)  Plaintiff reads magazines and newspapers and can walk a mile, but said that she could not

"stand for too long of a period of time" and that she "frequently take[s] . . . rest at home, as [she] is

doing her daily activities, sit down."  (Tr. at 424.)  Plaintiff testified that she could "probably" lift

25 pounds, but that she is not able to lift the 40 pound bag of dog food that she buys for her dog.

(Tr. at 424.)

After Plaintiff was examined by her attorney the ALJ re-examined Plaintiff regarding her

mental health treatment with Dr. LaKosky.  (Tr. at 427-431.)  The ALJ noted that Dr. LaKosky's

notes from 2002 do not

> say anything about missing any work, any absenteeism, any adjustments or
> accommodations. Clinically, she looks good and sounds good, he says. That's about
> the sum total of it. There [sic] total remission of depression and anxiety. Then, in
> June, again, it concludes, in a good remission of her depression and panic disorder.

(Tr. at 427.)  The ALJ asked Plaintiff "how do I reconcile that with what you're telling me?" and

Plaintiff responded "All I can say . . . is with the type of illness I have, I'm very up and down.  And

I believe that Dr. [LaKosky] was dwelling on the up."  (Tr. at 428.)  The ALJ noted "But if you're

down, it doesn't look like you went to see him or even called him if you're in any of these down

periods" and Plaintiff stated that she did call him during her down periods.  (Tr. at 428.)  The ALJ

then stated that he did not have any records of any such contact and that Dr. LaKosky did not

mention that Plaintiff did so.  (Tr. at 428-29.)  Plaintiff testified that she called Dr. LaKosky in

between visits in 2002.  The ALJ noted that in September, 2002, Dr. LaKosky filled out a form stating that Plaintiff was disabled and should not work for at least one year.  (Tr. at 429.)  The ALJ stated

> [i]n light of what I see here previously, [the fact that Dr. LaKosky stated that Plaintiff was disabled and should not work for at least one year is] kind of a surprise, because it saying you're doing so great and then all of a sudden, and having been 15 minutes, he seems to decide that you can't work for a year . . . that's a bit of a problem for me to reconcile that with everything you're telling me.

(Tr. at 429.)  The ALJ then asked Plaintiff's attorney whether there were any more records that should be in the file, and Plaintiff's attorney responded "[t]o my knowledge, that's the extent of the records . . .The only thing, I think [Plaintiff] did bring me something from her employment about days missed."  (Tr. at 429-30.)  The ALJ asked Plaintiff's attorney to submit an updated letter from her former employer discussing Plaintiff's work situation in 2001 and 2002; however, the record does not contain any such letter.  (Tr. at 1-2C; 430.)

### D.    Vocational Expert's testimony

Barbara Wilson-Jones testified as the Vocational Expert (hereinafter "VE") at the hearing on this matter.  The ALJ asked the VE to consider the following hypothetical:

> The claimant is now 55 years old, which makes her . . . a person of advanced age. Has . . . more than a high school education, does not have difficulties with communication.  Assume such a person with the residual functional capacity to perform medium work, subject to no hazardous moving machinery or unprotected heights, no power gripping with the right upper extremity, let's say avoid any vibrating hand tools due to bilateral carpal tunnel in the past.

(Tr. at 431-32.)  The VE testified that such an individual could perform Plaintiff's past relevant work.  (Tr. at 432.)  The ALJ then added to the hypothetical the following limitations:

> memory, generally unimpaired; intelligence at least average; not significantly limited for understanding and memory, sustained concentration and persistence, would have minimal limitations to maintain attention and concentration and completing a work

17

week at a consistent pace; social interaction, the possibility of some paranoid ideation toward sister and mother, but range of affect fairly limited but not inappropriate; stream of consciousness spontaneous, well-organized; thinking, relevant, coherent, goal-directed and responsive to questions, indicated to have less than substantial limitations getting along with coworkers; minimal limitations in adapting to changes; capable of completing simple tasks, getting along with coworkers and supervisors and adapting to changes.

(Tr. at 432-33.)  The ALJ asked the VE to determine whether such an individual could perform Plaintiff's past relevant work.  The VE testified that Plaintiff's past relevant work was classified as skilled work and that Plaintiff had some transferrable skills that she could utilize in other jobs.  (Tr. at 434-437.)  The ALJ then asked the VE to

assume for the moment that [the ALJ] would rule out all forms of skilled or unskilled, semi-skilled work, and leave it to unskilled at a medium level with the other physical limitations I gave you . . . no vibrating tools, no hazardous machinery, unprotected heights.  Would there be other jobs in the regional or national economy that such a person could perform?

(Tr. at 437.)  The VE testified that Plaintiff could perform the job of car and vehicle cleaner/washer, machine operator and packager and cleaner of lab equipment.  (Tr. at 438.)  The VE testified that there were approximately 1,700 car and vehicle cleaner/washer jobs, at least 3,000 machine operator and packager jobs and at least 2,000 lab equipment cleaner jobs in the Minnesota economy.  (Tr. at 438.)  The VE testified that, if Plaintiff was restricted to unskilled jobs with a light exertional level, Plaintiff could perform the job of mail clerk sorter, of which approximately 2,120 jobs exist in the Minnesota economy; machine tender for ejection molding, of which approximately 2,500 jobs exist in the Minnesota economy; order callers, of which there approximately 2,000 jobs exist in the Minnesota economy, and office helper, of which approximately 3,500 jobs exist in the Minnesota economy.  (Tr. at 438.)

###### E.      The ALJ's Decision

18

The ALJ issued an unfavorable decision on August 17, 2004.  (Tr. at 15-26.)  The ALJ engaged in the five step analysis as required by 20 C.F.R. §§ 404.1520 and 416.920.  (Tr. at 16.) Analyzing the first step, the ALJ determined that Plaintiff had not engaged in any substantial gainful activity since the alleged date of the onset of her disability.  (Tr. at 16.)  Looking at the second step, the ALJ also determined that Plaintiff suffers from "medically determinable severe impairments of an anxiety disorder, major depressive disorder, and a seizure disorder as well as carpal tunnel syndrome bilaterally status post releases and right ulnar transposition."  (Tr. at 18.)  The ALJ noted that Plaintiff suffered from several other impairments including migraines, but determined that Plaintiff "has not asserted disability for any of these impairments and the record does not indicate significant functional limitation as [a] result."  (Tr. at 18.)

Although the ALJ determined that Plaintiff suffered from the above severe impairments, at the third step of the analysis the ALJ concluded that Plaintiff did not have an impairment or a combination of impairments that met the Listing of Impairments in Appendix 1 to Subpart P of the Regulations, nor were Plaintiff's impairments or combination of impairments equivalent to the relevant criteria for any listed impairment.  (Tr. at 18.)  The ALJ noted that he "considered the criteria of section 11.14 with regard to . . . [Plaintiff's] elbow and wrist surgeries and 11.02 and 11.03 for her seizures."  (Tr. at 18.)  The ALJ further noted that he considered Plaintiff's mental health impairments, and found that Plaintiff suffered from "a Section 12.04 affective disorder with symptoms including a history of psychosis, low-energy, feelings of hopelessness, and intermittent paranoid ideation. . . . [and] a Section 12.06 anxiety disorder with symptoms including a history of panic and anxiety."  (Tr. at 18.)  In evaluating Plaintiff's mental health impairments, the ALJ evaluated Plaintiff's activities of daily living, social functioning, concentration, persistence or pace

19

and episodes of decompensation.  (Tr. at 19.)  After engaging in this evaluation, the ALJ concluded that the "C criteria" were not present for Plaintiff's mental impairments.  (Tr. at 19.)

The ALJ reviewed Plaintiff's activities of daily living and found that Plaintiff suffered from mild limitation in her daily activities due to her mental impairments.  (Tr. at 19)  The ALJ noted that Plaintiff reported that she engaged in a wide range of household activities including "cooking, cleaning, caring for a pet, shopping and yard work."  (Tr. at 19.)   The ALJ noted that Plaintiff "denied difficulty with self cares unless she was psychotic."  (Tr. at 19.)  Plaintiff reported to the ALJ that she was interested in sewing and painting and she read the newspaper, operated an automobile and attended church.  (Tr. at 19.)   The ALJ opined that Plaintiff's "testimony is significant for reports of activities including going to the planetarium, going with her husband when he fishes, dining out, doing church related activities, gardening, reading magazines or newspapers, shopping, cooking, cleaning, occasionally doing the checkbook, and running errands."  (Tr. at 19.) Based on this evidence, the ALJ found "a regular and recurrent level of activities that does not suggest more than mild functional limitation as a result of her mental limitations."  (Tr. at 19.)

Turning next to an investigation of Plaintiff's ability to function socially in light of her mental impairments, the ALJ concluded that Plaintiff had mild limitations in her social functioning. (Tr. at 19.)  The ALJ noted that Plaintiff testified to engaging in church activities, going out to eat with her husband and contacting friends on the telephone regularly.  (Tr. at 19.)  The ALJ further opined that the activities of daily living that Plaintiff engages in "indicate that she is able to function in many environments."  (Tr. at 19.)  The ALJ further noted that while Plaintiff "has reported some avoidant features [she] . . . also reports having many friends."  (Tr. at 19.)  The ALJ noted that there were some subjective reports from Plaintiff to Dr. Speare indicating some paranoia and possible

delusions, but the ALJ concluded that "the record does not confirm through other means a significant degree of paranoia which would cause significant functional limitation." (Tr. at 19.) The ALJ further concluded that

> only mild impairment is found as the overall medical record of clinical contact does not indicate a presentation consistent with significant paranoia, delusions or psychosis which is noted to impact her function or presentation. Further, the detailed examination in consultation by Dr. Speare shows that she is relevant, coherent, ankle [sic] directed in her response. Her hygiene is adequate and he does not document auditory or visual hallucination responses. He notes insight and judgment appear relatively unimpaired.

(Tr. at 19.)

Looking at Plaintiff's concentration, persistence or pace, the ALJ determined that Plaintiff was moderately impaired in this area due to her mental impairments. (Tr. at 19.) When making this finding the ALJ relied on Dr. Speare's evaluation "which indicates that . . . [Plaintiff] is able to perform simple calculations and calculations with word problems . . . [has] a generally unimpaired memory and average fund of knowledge . . . [has] abstract reasoning [that] is intact and . . . her insight and judgment [is] not impaired." (Tr. at 19.) The ALJ noted that "[t]he most significant finding was on serial seven calculations and difficulty with digit recall." (Tr. at 19.) However, the ALJ concluded that "these findings do not suggest marked cognitive deficit particularly noting the absence of documented episodes of psychosis, delusions or other psychotic break since the alleged onset date of disability." (Tr. at 19.) The ALJ also noted "reports of difficulties tolerating stress" and stated that he "considered this in reducing the estimate of . . . [Plaintiff's] functioning." (Tr. at 20.) Finally, the ALJ concluded that Plaintiff did not "have documented episodes of decompensation [because] [t]here [wa]s no documented increase in psychiatric frequency of evaluation . . . [Plaintiff had not] been hospitalized and ha[d] not . . . initiated psychological

counseling." (Tr. at 20.)

After determining that Plaintiff's mental health impairments did not meet or equal any of the listed impairments, the ALJ moved on to the fourth step in the sequential analysis; that is, the ALJ looked at whether Plaintiff has a residual functional capacity ("RFC") "that permits the performance of relevant past work or any other work existing in significant numbers in the national economy." (Tr. at 20.)  The ALJ noted that "[d]etermination of the [RFC] requires evaluation of the medical records and assessments of the claimant's subjective complaints under Social Security Rule 96-7p, 20 C.F.R. §§ 404.1529(c) & 416.929(c), and Polaski v. Heckler, 739 F.2d 1320 (8th Cir.1984)." (Tr. at 20.)  The ALJ also noted that Polaski held that "subjective complaints may be discounted if there are significant inconsistencies in the record as a whole."  (Tr. at 20.)

The ALJ began his analysis of Plaintiff's RFC by noting that Plaintiff worked for 28 years in social services and

> testified that she was unable to continue with this work because of mental health problems including confusion and that she was unable to do the mental tasks required for work.  She testified that she sees Dr. LaKosky for psychiatric care for 15 minutes on a quarterly basis.  She had marriage counseling which was fine but has not otherwise had counseling recently. . . . She has been on medications steadily since 1988 and has tried many medications.  She presently takes Celexa 40 mg as well as Klonopin 1 mg one to three times per day and Seroquel 25 mg from one to six tablets per day.  She took these medications when she was working but notes that the dosage has varied.  She testified that she had been in social services for 14 years when she fell ill and has been accommodated by her employer . . . letting her come in on weekends and come in early.  She testified that at the end of her employment she was allowed to go home and sleep or rest for two hours and [that] . . . she was absent at least one day per week.

(Tr. at 20-21.)  The ALJ further noted that Plaintiff testified that she had surgery on both wrists as a result of her bilateral carpal tunnel syndrome and also had surgery on her right ulnar nerve and that each surgery was successful.  (Tr. at 21.)

22

The ALJ related Plaintiff's testimony that she is "able to walk a mile but that she has trouble standing for prolonged times . . . she can lift 25 pounds [but] . . . she cannot lift a 40 pound bag of dog food."  (Tr. at 21.)  The ALJ also noted that Plaintiff testified that

> [s]he drove to her hearing.  She has traveled to Pennsylvania for two weeks to meet her husband's family . . . she does not think she can work because her thoughts are not clear enough or well-managed enough to be able to report to work regularly and to do the mental tasks required.  She stated that at home on some days she cannot manage her checkbook.  She notes such symptoms occurring once per week.

(Tr. at 21.)

After reviewing the above facts, the ALJ concluded that he did not find Plaintiff's "subjective complaints to be fully credible due to significant inconsistencies in the overall record." (Tr. at 21.)  Therefore, the ALJ concluded that Plaintiff has the following RFC:

> The undersigned finds that [Plaintiff] retains the [RFC] for medium exertional work . . . defined as work lifting 50 pounds with frequent lifting or carrying of objects weighing up to 25 pounds, standing and/or walking 6 of 8 hours, and sitting 2 of 8 hours.  20 C.F.R. § 404.1567(c).  This capacity is reduced by her inability to work near hazardous moving machinery or at unprotected heights.  She should not be required to use a power grip with her right hand and she should avoid vibrating hand tools due to her bilateral carpal tunnel syndrome.  Work is also restricted to an unskilled basis.

(Tr. at 21.)  The ALJ determined that the "objective medical record [did not] fully support[] [Plaintiff's] allegations as to the degree of severity of her impairments," because the ALJ believed there were significant inconsistencies in the overall record regarding Plaintiff's physical and mental impairments.  (Tr. at 21.)  The ALJ noted that Plaintiff had been treated for a single seizure with medications but that "a head CT scan and EEG were negative as were laboratory tests [and there did not] appear to be any continuing organic deficits to warrant additional functional limitation [nor did a] [p]hysical examination . . . show significant neurological or orthopedic deficit to warrant additional functional limitation."  (Tr. at 21-22.)

23

The ALJ noted that a postoperative evaluation of Plaintiff's left hand "on March 11, 2003 found very little swelling and full range of motion of the left fingers [and that] [s]imilar findings were noted on June 3, 2003 following the right sided surgeries." (Tr. at 22.) In addition, there were "no subsequent physical examinations to suggest continued impairment and [Plaintiff] reported that the surgeries were successful." (Tr. at 22.)

The ALJ also concluded that there was a "paucity of findings to support [Plaintiff's] allegations with regards to her mental impairments." (Tr. at 22.) In support of this conclusion, the ALJ noted that

> [t]he consultative evaluation at the request of Social Security by Dr. Speare shows only slight concentration deficits. The undersigned can credit reports that she is unable to do skilled employment but does not find that the severity of her reported symptoms are documented with regard to cognitive loss. Although [Plaintiff] has [been] treated [by] Dr. LaKosky for many years, his clinical notes contain no mental status finding.

(Tr. at 22.) In support of his conclusion that there were significant inconsistencies in the overall record regarding Plaintiff's physical and mental impairments, the ALJ noted that

> [t]he record does not contain a series of emergency room visits or urgent care visits for her physical impairments or crisis intervention for her mental impairments. Her seizures have not reportedly recurred. The record shows only minimal physical therapy and suggests that this ended in part due to insurance reasons and unspecified mental health reasons. [Plaintiff] denies in testimony recent counseling other than marriage counseling. She acknowledges quarterly psychiatric medication checks lasting 15 minutes. This pattern of treatment for physical or mental concerns is not particularly impressive.

(Tr. at 22.) The ALJ stated that Plaintiff "reported that her hand symptoms were not severe before surgery." (Tr. at 22.) The ALJ also noted that while Plaintiff told Dr. Speare that "her mood [wa]s a negative six or seven on a 20 point scale . . . she also only describes 'a kind of low mood' and there is no significant evidence of an increase in treatment consistent with such a low mood." (Tr.

24

at 22.)

The ALJ also considered Plaintiff's use of medication to alleviate her conditions but found that such use did not fully support her allegations of disability. The ALJ noted that "[o]n September 18, 2002, when [Plaintiff] present[ed] a form for disability benefits to her psychiatrist, there does not appear to be any significant change in her medication prescriptions from her previous visit with the exception of Pamelor reduction. . . . This would not suggest significant deterioration." (Tr. at 22.) The ALJ further noted that Plaintiff

> has reported a variable degree of medication use. However, in evaluating this report as well as [Plaintiff's] reports of symptoms severity, the undersigned notes that there does not appear to be medical records from her treating psychiatrist from September 18, 2002 until she returns on July 21, 2003. . . . However, a review of her medications on those two dates indicates no significant change other than the absence of Pamelor/nortriptyline. Her present medication is also markedly unchanged. The clinical record does not fully support her subjective complaints as to a deteriorating or debilitating condition.

(Tr. at 23.)

The ALJ concluded:

> The undersigned fully adopts the opinion of the state agency medical consultants with regards to [Plaintiff's] physical abilities. No contradictory opinion is noted although she was told not to lift more than 10 pounds for the timeframe immediately after her left-handed carpal tunnel release in March 2003. She was then without restriction.

> The undersigned has considered the findings of the state agency medical consultants that [Plaintiff] is able to do simple tasks include [sic] get along well with coworkers and supervisors and that she can adapt to changes. These are generally consistent with the [RFC].

(Tr. at 23.)

The ALJ also considered the assessment of Dr. Speare, the consultative examiner, when determining Plaintiff's mental RFC. Unlike the state agency medical consultants, Dr. Speare opined that Plaintiff "cannot tolerate the pace and persistence of entry level work or interpersonal contact."

(Tr. at 23.)  The ALJ did not

> find this opinion consistent with [Dr. Speare's] evaluation. . . . [Dr. Speare] notes only some concentration deficits but not to [an] extent which could reasonably preclude competitive work.  He was unable to confirm the delusions or paranoia with regards to her mother and daughter.  He estimates a global assessment of functioning which would suggest that she requires hospitalization, an event that has not occurred at any time since October 2002.  The undersigned can reasonably accept his objective findings but disagree with his conclusions in light of alternative interpretation by the State Agency.  He appears to rely on her subjective reporting more than his findings.  Further, many of [Plaintiff's] reports as to inability to continue working appear job specific and do not represent the entire world of work.

(Tr. at 23.)

In addition, the ALJ considered the opinion of Dr. LaKosky, Plaintiff's treating psychiatrist,

when determining Plaintiff's mental RFC.  The ALJ did not find Dr. LaKosky's conclusion, that

Plaintiff is not employable,

> consistent with the weight of the medical record including his own clinical evaluations which appear to indicate that [Plaintiff's] mental health impairments are well controlled.  This was his assessment in October 2003 and July 2003.  He does note that [Plaintiff] does not appear to be doing well in September 2002 [but] on August 21, 2003, he advises that [Plaintiff] should be disabled if her present[] (job) position could not be modified . . . It appears that he is considering her employment as a social worker.  The undersigned concedes this job is beyond the [RFC].

(Tr. at 23-24.)  The ALJ considered Dr. LaKosky's November 2003 and May 2004 reports, wherein

Dr. LaKosky

> opines [Plaintiff] cannot be gainfully employed and he states a chronological worsening of [her] condition.  However, his letters state primarily symptoms without reference to frequency or chronology.  It is also clear from [Plaintiff's] reports of activities, confirmed by her husband and her testimony, that she is able to function in a wide variety of environments, situations, and tasks.

(Tr. at 24.)

After the ALJ considered the opinions of the state agency medical consultants, Dr. Speare

and Dr. LaKosky, the ALJ considered Plaintiff's "motivation for work and her employment history." (Tr. at 24.)  While the ALJ noted that Plaintiff had an "impressive history of wages" the ALJ concluded that the record did not sufficiently demonstrate that Plaintiff "sought alternative occupational endeavors of a less stressful or complex nature." (Tr. at 24.)  The ALJ further noted that there was "no empiric evidence of a failure at such work which would be more persuasive in showing that she is unable to perform any work that exists in significant numbers in the regional or national economy." (Tr. at 24.)  The ALJ stated that while Plaintiff "testified to numerous accommodations [from her former employer, these accommodations were] not corroborated by credible third party sources." (Tr. at 24.)  After completing his review of the evidence, the ALJ concluded that the mental and physical RFC assigned to Plaintiff was appropriate.

After determining that he assigned the appropriate RFC to Plaintiff, the ALJ looked to the testimony of the VE to determine whether Plaintiff had the ability to perform her past relevant work. The VE testified that Plaintiff could not perform her past relevant work; therefore, the burden shifted to the Commissioner of Social Security to show that there was other work that Plaintiff could perform, taking into consideration her medically determinable physical and mental impairments, RFC, age, education, and relevant work history.  The VE testified that Plaintiff could perform the jobs of car and vehicle cleaner/washer, a machine operator and packager and a lab equipment cleaner. (Tr. at 24.)  The VE testified that there were 1,700 jobs as a car and vehicle cleaner/washer in Minnesota, 3,000 jobs as a machine operator/packager and 2,000 jobs as a lab equipment cleaner in Minnesota. (Tr. at 24.)  The ALJ found the VE's testimony "to be credible, persuasive and uncontradicted" and determined that the Commissioner met its burden to prove that a significant number of jobs exist in the regional economy that Plaintiff could perform. (Tr. at 24.)  Since the

ALJ determined that there were a significant number of jobs in the regional economy that Plaintiff could perform, the ALJ concluded that Plaintiff did not meet the statutory criteria for disability and stated that Plaintiff was not entitled to a period of disability or disability insurance benefits under the Social Security Act.  (Tr. at 24.)

## III.  STANDARD OF REVIEW

Judicial review of the final decision of the Commissioner is restricted to a determination of whether the decision is supported by substantial evidence on the record as a whole.  See 42 U.S.C. § 405(g);  see also Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir.1998); Gallus v. Callahan, 117 F.3d 1061, 1063 (8th Cir.1997); Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir.1989).  Substantial evidence means more than a mere scintilla; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  See Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co., v. NLRB, 305 U.S. 197, 220 (1938)).  In determining whether evidence is substantial, a court must also consider whatever is in the record that fairly detracts from its weight.  See Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir.1999); see also Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir.1989) (citing Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951)).

A court, however, may not reverse merely because substantial evidence would have supported an opposite decision.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir.2000); see also Gaddis v. Chater, 76 F.3d 893, 895 (8th Cir.1996).  "As long as substantial evidence in the record supports the Commissioner's decision, we may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome . . . or because we would have decided the case differently."  Roberts v. Apfel, 22 F.3d at 468 (citing Craig v. Apfel, 212 F.3d 433, 436 (8th

Cir.2000); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir.1993)).   "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."   Id.   Therefore, our review of the ALJ's factual determinations is deferential, and we neither re-weigh the evidence, nor review the factual record de novo.  See Flynn v. Chater, 107 F.3d 617, 620 (8th Cir.1997); Roe v. Chater, 92 F.3d 672, 675 (8th Cir.1996).   The Court must "defer heavily to the findings and conclusions of the SSA."   Howard v. Massanari, 255 F.3d 577, 581 (8th Cir.2001).

Disability is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 404.1505(a).   Plaintiff bears the burden to show that she suffers from a medically determinable impairment.   See 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commission . . . may require.")  The Secretary promulgated a sequential evaluation process to be used to determine whether a person is disabled, and this process applies to both physical and mental disorders.  20 C.F.R. §404.1520 outlines the five-step sequential process used by the ALJ to determine whether a claimant is disabled.  The disability determination requires a step-by-step analysis.  See 20 C.F.R. §404.1520(a).  At the first step, the ALJ must consider Plaintiff's work history.  At the second step, the ALJ must consider the medical severity of Plaintiff's impairments. At the third step, the ALJ must consider whether Plaintiff has an impairment or impairments that meet or equal one of the listings in Appendix 1 to Subpart P of the regulations.   See 20 C.F.R. 404.1520(d).  If Plaintiff's impairment does not meet or equal one of the listings in Appendix 1, then

the ALJ must make an assessment of Plaintiff's residual functional capacity and Plaintiff's past

relevant work.  If the ALJ determines that the claimant can still perform his or her past relevant

work, the ALJ will find that the claimant is not disabled.  If the claimant cannot perform his or her

past relevant work, then the "burden shifts to the Commissioner to prove, first, that the claimant

retains the [RFC] to perform other kinds of work, and, second, that other such work exists in

substantial numbers in the national economy."  <u>Cunningham v. Apfel</u>, 222 F.3d 496, 501 (8th

Cir.2000).

## IV.  CONCLUSIONS OF LAW

### A.      Plaintiff's Motion for Remand to Consider New Evidence Should Be Denied.

According to 42 U.S.C. Section 405(g),

> The court . . . may at any time order additional evidence to be taken before the
> Commissioner of Social Security, but only upon a showing that there is new
> evidence which is material and that there is good cause for the failure to incorporate
> such evidence into the record in a prior proceeding.

42 U.S.C. § 405(g).  The Eighth Circuit noted that "[t]o be considered material, the new evidence

must be 'non-cumulative, relevant and probative of the claimant's condition for the time period for

which benefits were denied.' "  <u>Jones v. Callahan</u>, 122 F.3d 1148, 1154 (8th Cir.1997) (quoting

<u>Woolf v. Shalala</u>, 3 F.3d 1210, 1215 (8th Cir.1993)).  In addition, "it must be reasonably likely that

the Commissioner's consideration of this new evidence would have resulted in an award of

benefits."  <u>Jones v. Callahan</u>, 122 F.3d at 1154.

"An implicit requirement [for a remand based on additional evidence] is that the new

evidence pertain to the time period for which benefits are sought, and that it not concern later-

acquired disabilities or subsequent deterioration of a previously non-disabling condition."  <u>Id</u>.  The

Eighth Circuit opined that "[a]dditional evidence showing a deterioration in a claimant's condition significantly after the date of the Commissioner's final decision is not a material basis for remand, although it may be grounds for a new application for benefits." Id.

The evidence that Plaintiff seeks to incorporate falls into two main categories: evidence that existed prior to the administrative hearing and evidence that came into existence after the conclusion of that hearing.  The Court will examine both types of evidence in turn.

> **a.    Good cause does not exist to grant Plaintiff's motion for remand to consider the evidence that existed prior to the administrative hearing.**

Plaintiff argues that good cause exists to permit this Court to remand this case back to the Commissioner for the inclusion of new and material evidence that existed prior to the hearing but was not submitted to the ALJ at the hearing.  This evidence includes: (1) the PERA disability records that existed prior to June 9, 2004; (2) the treatment records from Range Mental Health Center for the time period of 1987 through November 6, 1996; November 2002; April 2003; and June 30, 2004; (3) Virginia Regional Medical Center treatment records from October 24 and 25, 2002; and (4) University Medical Center-Mesabi hospital records concerning Plaintiff's psychiatric hospitalization from May 10, 1997, through May 13, 1997.

Plaintiff argues that there is good cause for her failure to incorporate this evidence into the prior record.  Plaintiff argues that "[i]t was the ALJ's duty to fully and fairly develop the record, and that was not done."  (Pl.'s Mem. at 16.)  Plaintiff notes that the ALJ had notice that the PERA determined that Plaintiff was disabled and that Dr. LaKosky filled out a form to effectuate that determination; however, the ALJ failed to request the PERA records, nor did he specifically request that Plaintiff's attorney obtain those records.  Plaintiff further argues that, while the ALJ noted that Plaintiff suffered a psychotic break in 1997, he failed to obtain the records from that hospitalization.

31

Plaintiff also argues that, since the ALJ knew that Plaintiff had been receiving mental health treatment since 1987, the ALJ should have obtained her mental health records dating back to 1987.

As the claimant in this case, Plaintiff bears the burden of proving that she suffers from a disability. 20 C.F.R. §§ 404.1512(a), 416.912(a). Therefore, although "it is the duty of the ALJ to fully and fairly develop the record, even when . . . the claimant is represented by counsel" Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir.2000), the claimant also has a responsibility to put her strongest case forward. In the present case, Plaintiff argues that, by virtue of the ALJ's duty to fully and fairly develop the record, good cause exists to permit her to introduce evidence that existed prior to the hearing that she failed to proffer. In essence, Plaintiff argues that, because the ALJ has a duty to fully and fairly develop the record, good cause exists for her failure to include evidence and she is therefore excused from the requirement that she bear the burden of proving her disability case.

Other than asserting that it was the ALJ's duty to fully and fairly develop the record, and that the ALJ should have specifically requested that Plaintiff provide him with the missing evidence in order to fulfill that duty, Plaintiff has not argued that any other facts provide good cause for her failure to include the above referenced evidence in the record at the time of the administrative hearing. While the ALJ does have a duty to fully and fairly develop the record, this duty does not alleviate Plaintiff's burden of proving that she suffers from a disability, nor does the ALJ's failure to fully develop the record constitute good cause for Plaintiff's failure to include relevant, obtainable evidence of her disability in the record in the first instance. Since Plaintiff has not shown good cause for her failure to include the above referenced evidence, the Court recommends that her

motion for remand be denied.[3]

> **b.** **The new evidence that was generated after the administrative hearing should not be admitted into the record at this time.**

There are several types of evidence that Plaintiff seeks to submit that were developed subsequent to the administrative hearing on this matter.  First, Plaintiff seeks to admit PERA disability records from October 2004 and October 2005 into the administrative record in this matter. The PERA records consist of letters and reports from October, 2004, and October, 2005, and they concern Plaintiff's condition on those dates.  The PERA disability records are not relevant in the present case because these records do not relate to Plaintiff's condition as it existed within the time frame that the ALJ reviewed at the administrative hearing.  See Jones v. Callahan, 122 F.3d at 1154.

Second, Plaintiff also seeks to admit the mental health treatment records created after the hearing on this matter that span from October 2004 through March 2006.  Such reports and records are not relevant to the ALJ's determination regarding Plaintiff's condition between the alleged date of onset of her disability, in October, 2002, and the ALJ's determination on August 17, 2004.  Id. Therefore, the Court recommends that insofar as the motion to remand seeks to include these records, that the motion be denied.

In addition, Plaintiff seeks to introduce a letter and Mental Functional Capacity assessment from Dr. LaKosky that was completed on May 30, 2006, and a letter from the Personnel Officer of Plaintiff's former employer, which is dated June 8, 2006.  Plaintiff cannot show good cause as to why these two letters, which both concern Plaintiff's condition during the relevant time period, were

---

[3] However, as noted in the next section, the ALJ's failure to fully and fairly develop the record has its own consequences; that is, the underdeveloped record in this case cannot provide substantial evidence on the record as a whole to support the ALJ's mental RFC finding.

not requested by Plaintiff prior to the administrative hearing on this matter. While the ALJ has the

burden to fully and fairly develop the record, the claimant bears the burden of proving she suffers

from a disability and Plaintiff has not come forward with good cause to show why she did not obtain

these two letters prior to the administrative hearing on this matter.[4] The information contained in

both these letter existed prior to the administrative hearing, and Plaintiff has not presented the Court

with good cause as to why these letters were not procured prior to the hearing. Therefore, the Court

recommends that Plaintiff's motion be denied.

### B. Plaintiff's Motion for Summary Judgment

#### 1. The ALJ's findings regarding Plaintiff's mental RFC are not supported by substantial evidence on the record as a whole.

Plaintiff argues that the ALJ failed to give the opinions of Dr. LaKosky, her treating

physician, the weight required by the Code of Federal Regulations.[5] According to the Code of

---

[4] Again, as noted in the next section, the ALJ's failure to fully and fairly develop the record has its own consequences, as an underdeveloped record will not constitute substantial evidence on the record as a whole to support the ALJ's mental RFC finding. However, as the standard for admitting new evidence under 42 U.S.C. § 405(g) is good cause, the Court must deny Plaintiff's motion for remand because, even though the ALJ did not fully and fairly develop the record in the present case, Plaintiff cannot show good cause for her failure to include these records in the first instance, and the ALJ's failure to fully and fairly develop the record does not provide the good cause required by 42 U.S.C. § 405(g).

[5] Plaintiff also argues that the ALJ "failed to discuss whether [Plaintiff's] impairments meet the requirements of part C of the Listings." (Pl.'s Mem. at 39.) However, the ALJ specifically found that the C criteria were not present in Plaintiff's case, and Plaintiff does not explicitly argue that the evidence establishes that her impairments meet or equal any of the mental impairment listings. (See Tr. at 19.) Plaintiff bears the burden of proof on this issue, and has failed to prove that she meets the C criteria for mental impairment listing 12.04, as she has not demonstrated that she experienced either: "(1) repeated episodes of decompensation, each of extended duration; or (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) [a] current history of 1 or more years' inability to function outside a highly supportive living arrangement." 20 C.F.R. Part 404,

34

Federal Regulations, a treating physician's opinion is to be afforded "controlling weight" when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(d)(2).   Under the regulations, a "treating source" is a physician, psychologist, or other acceptable medical source who has an "ongoing treatment relationship" with the claimant, i.e., the claimant has seen the physician "with a frequency consistent with accepted medical practice" for the condition.  See 20 C.F.R. § 404.1502. Under the Social Security regulations, when an ALJ determines that a treating source's opinion is not entitled to controlling weight, an ALJ considers the following factors in deciding what weight to give the treating source's opinion: (1) the treatment relationship, considering the length, frequency of examination, nature and extent of the treatment relationship; (2) the extent to which the opinion is supported by medical evidence; (3) the extent to which the opinion is consistent with the record as a whole; (4) whether the opinion is that of a specialist on issues relating to his or her specialty; and (5) other factors which tend to support or contradict the opinion.  20 C.F.R. §§ 404.1527(d)(2)-(6).

Generally, the opinions of doctors who do not examine the plaintiff do not ordinarily constitute substantial evidence to support a finding of non-disability.  Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).  The ALJ is required to give more weight to the opinion of a treating source versus a non-treating source.  Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).  The Eighth

---

Subpart P, Appendix 1, Listing 12.04(C).  In addition, Plaintiff has failed to prove that her impairments resulted in a "complete inability to function independently outside the area of one's home" as required by paragraph C of 12.06, the other applicable mental impairment listing.  See 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.06(C).  In addition, Dr. Koretzky concluded that the evidence in Plaintiff's medical file did not satisfy the C criteria of either Listing.  (Tr. at 334.)  Therefore, the ALJ's finding that Plaintiff does not meet the "C" criteria for Listing 12.04 or 12.06 is supported by substantial evidence on the record as a whole.

Circuit has stated "[g]enerally, even if a consulting physician examines a claimant once, his or her opinion is not considered substantial evidence, especially if . . . the treating physician contradicts the consulting physician's opinion." Lauer v. Apfel, 245 F.3d 700, 705 (8th Cir.2001); see also Lanning v. Heckler, 777 F.2d 1316, 1318 (8th Cir.1985) (quoting Hancock v. Secretary of Dept. of Health, Educ. and Welfare, 603 F.2d 739, 740 (8th Cir.1979)).

However, "[t]he conclusions of any medical expert may be rejected [by the ALJ] 'if inconsistent with the medical record as a whole.'" Davis v. Apfel, 239 F.3d 962, 967 (8th Cir.2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir.1995)). An ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir.2000). No matter what weight the ALJ determines the treating physician's opinion should be afforded, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir.2005)(quoting 20 C.F.R. § 404.1527(d)(2)).

The ALJ may give special weight only to a practitioner's medical judgment about the nature and severity of a claimant's impairments. 20 C.F.R. §§ 404.1527(a)(2); 416.927(a)(2). If a medical practitioner expresses an opinion on an issue that is reserved to the Commissioner, such as the claimant's RFC, whether a claimant is disabled, or whether the claimant meets a Listing, the ALJ must consider the opinion, but Social Security regulations expressly bar the ALJ from giving any special significance to the source of the opinion, and it is never entitled to controlling weight. 20 C.F.R. § 404.1527(e)(3); SSR 96-5p.

36

However "medical source statements may actually comprise separate medical opinions regarding diverse physical and mental functions, such as walking, lifting, seeing . . . and . . . it may be necessary to decide whether to adopt or not adopt each one." SSR 96-5p.  A claimant's RFC is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect . . . her capacity to do work-related physical and mental activities." SSR 96-8p.  The RFC is an assessment of the claimant's "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." SSR 96-8p.  A "regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p.

The RFC assessment is "based on all of the relevant evidence in the case record, including information about the individual's symptoms and any 'medical source statements' - - i.e., opinions about what the individual can still do despite . . . her impairment(s)." SSR 96-8p.  The RFC assessment "must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p.  While the ALJ "bears the primary responsibility for assessing a claimant's [RFC] based on all relevant evidence," Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir.2000), the Eight Circuit has also noted that a claimant's RFC is "a medical question." Singh v. Apfel, 222 F.3d 448, 451 (8th Cir.2000).

### a.      The ALJ failed to fully and fairly develop the record.

The Eighth Circuit noted that it is "well settled law that it is the duty of the ALJ to fully and fairly develop the record, even when . . . the claimant is represented by counsel." Nevland v. Apfel,

204 F.3d 853, 857 (8th Cir.2000).  This duty includes the duty to develop the record in regards to

the medical opinion of the claimant's treating physician.  As the Eighth Circuit noted in <u>Lewis v.</u>

<u>Schweiker</u>, "if a treating physician . . . has not issued an opinion which can be adequately related

to the [Social Security Act's] disability standard, the ALJ is obligated . . . to address a precise

inquiry to the physician so as to clarify the record."  720 F.2d 487, 489 (8th Cir.1983).  "'An

administrative law judge may not draw upon his own inferences from medical reports.'"  <u>Nevland</u>,

204 F.3d at 858 (quoting <u>Lund v. Weinberger</u>, 520 F.2d 782, 785 (8th Cir.1975)).

In the present case, the ALJ did not fully and fairly develop the record.[6]  The ALJ

acknowledged that he did not have a full record of Dr. LaKosky's opinion at the hearing on this

matter.  The ALJ stated at the hearing:

> the last record I have is in June, I have nothing in between June and September here,
> and now he's saying one month, so that would imply you might have seen him in
> between, but I don't have any record of that.  Here, he's saying, you're having
> trouble with depression, thinking is not real, well, marriage is going well, seems
> overwhelmed by work, and he's got a form from you to fill out stating that you're
> disabled and shouldn't work for at least a year.  In light of what I see here
> previously, that's kind of a surprise, because it [is] saying that you're doing so great
> and then all of a sudden, and having been 15 minutes, he seems to decide that you
> can't work for a year.  I, you understand what I'm trying to get at here, that's a bit
> of a problem for me to reconcile that with everything you're telling me.  And I don't
> know how to do that.

---

[6] Although this Court previously denied Plaintiff's motion for remand, stating that
Plaintiff did not show good cause for a remand to consider new and material evidence, the Court
has determined that the ALJ did not fully and fairly develop the record and should have asked
for additional evidence.  The Court was constrained by the standard for a motion for remand,
which requires Plaintiff to show good cause for failing to include relevant evidence, and
therefore was forced to deny that motion because Plaintiff could not demonstrate good cause.
However, Plaintiff's inability to demonstrate good cause does not negate the ALJ's duty to fully
and fairly develop the record.  The fact that the Court denied Plaintiff's motion for remand does
not restrict the Court's ability to investigate whether the ALJ fully and fairly developed the
record in this case and whether any conclusions he made on the record could be supported by
substantial evidence on the record as a whole.

(Tr. at 429.)  The ALJ then asked Plaintiff's attorney whether there were any more records that should be in the file, and Plaintiff's attorney responded "[t]o my knowledge, that's the extent of the records . . . the only thing, I think Judy did bring me something from her employment about days missed."  (Tr. at 429-30.)

It is clear that the ALJ recognized that the record was not fully developed concerning Dr. LaKosky's opinions.  The ALJ told Plaintiff that he had "a bit of a problem" reconciling Dr. LaKosky's treatment records with Plaintiff's testimony and with Dr. LaKosky's own determination that Plaintiff was disabled.  In this way the ALJ failed in his duty to fully and fairly develop the record.  He acknowledged that there was some missing information in Dr. LaKosky's files, yet he failed to contact Dr. LaKosky to ask him to explain the extent of Plaintiff's mental disabilities.  The ALJ stated that "[a]lthough [Plaintiff] has [been] treated [by] Dr. LaKosky for many years, his clinical notes contain no mental status findings."  (Tr. at 22.)  In such a situation, "if a treating physician . . . has not issued an opinion which can be adequately related to the [Social Security Act's] disability standard, the ALJ is obligated . . . to address a precise inquiry to the physician so as to clarify the record."  Lewis v. Schweiker 720 F.2d at 489.  The ALJ did not do so.  In such a case the ALJ had the duty to fully develop the record by asking Dr. LaKosky to make specific mental status findings.  Dr. LaKosky is Plaintiff's treating psychiatrist and the ALJ should have sought clarification from him regarding the extent of Plaintiff's mental disabilities.  See 20 C.F.R. § 404.1512(e)(1) ("We will seek additional evidence of clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, [or] the report does not contain all the necessary information.")

While the ALJ was not required to give special weight to Dr. LaKosky's opinion that

Plaintiff was disabled and incapable of work, as disability is an issue reserved for the Commissioner, see 20 C.F.R. § 404.1527(e)(3); SSR 96-5p, the ALJ did have a duty to fully and fairly develop the record regarding the reasons and diagnoses behind this opinion.  The ALJ was required to seek additional evidence to clarify the specific bases on which Dr. LaKosky rested his opinion that Plaintiff's mental impairments caused her to be incapable of any substantial gainful activity.

In reviewing the medical records Plaintiff submitted from Dr. LaKosky, the ALJ noted that

> there does not appear to be medical records from her treating psychiatrist from September 18, 2002, until she returns on July 21, 2003.  However, review of her medications on those two dates indicates no significant change other than the absence of Pamelor/nortriptyline.  Her present medication is also markedly unchanged.  The clinical record does not fully support her complaints as to a deteriorating or debilitating condition.

(Tr. at 23.)  The ALJ clearly noted that there did not appear to be medical records in her file from September 18, 2002, through July 21, 2003.  The ALJ should have contacted Dr. LaKosky concerning the missing medical records to fully and fairly develop the record.  Instead, the ALJ stated that he was

> not persuaded by the opinion of [Plaintiff's] treating physician, Dr. LaKosky, who indicated that [Plaintiff] is not employable . . . The undersigned does not find this conclusion consistent with the weight of the medical record including his own clinical evaluations which appear to indicate that [Plaintiff's] mental health impairments are well controlled.  This was his assessment in October 2003 and July 2003.  He does note that [Plaintiff] does not appear to be doing well in September 2002.  However, on August 21, 2003, he advises that the claimant should be disabled if her present[] (job) position could not be modified . . . It appears that he is considering her employment as a social worker [which the ALJ conceded was] beyond the [RFC].

(Tr. at 23-24.)  The ALJ is making assumptions regarding the underlying opinions of Dr. LaKosky, when the appropriate response to the record before the ALJ was to inquire further into Dr. LaKosky's opinions by asking Dr. LaKosky for additional information.  The ALJ continued by

noting that he also

> considered [Dr. LaKosky's] November 2003 and May 2004 reports.  In these reports [Dr. LaKosky] opines [Plaintiff] cannot be gainfully employed and he states a chronological worsening of [her] condition.  However, his letters state primarily symptoms without reference to frequency or chronology.  It is also clear from [Plaintiff's] reports of activities, confirmed by her husband and her testimony, that she is able to function in a wide variety of environments, situations, and tasks.

(Tr. at 24.)  The ALJ obviously required an opinion from Dr. LaKosky that related Plaintiff's symptoms with "reference to frequency [and] chronology" and should have asked Dr. LaKosky for such an opinion rather than proceeding to disregard Dr. LaKosky's opinions.

Not only did the ALJ ignore the opinions of Dr. LaKosky, Plaintiff's treating physician, but he also ignored the opinions of Dr. Speare, the consultative examiner, which supported Dr. LaKosky's opinions.  Dr. LaKosky noted in his first letter to Mr. Kearney that Plaintiff's mental illness "seems to absorb too much of her thinking and energy [and that] [s]he has trouble functioning beyond activities of daily living and within the confines of her marriage."  (Tr. at 394.)  In his second letter to Mr. Kearney, Dr. LaKosky noted that "[i]n spite of being on above average medication dosages, [Plaintiff] has not been able to go into remission of her illness."  (Tr. at 412.)  Dr. LaKosky further noted in his second letter to Mr. Kearney that Plaintiff's

> psychiatric state has been a bit better since being off work.  She remains, however, quite fragile and very easily goes back into a more severe depression with psychotic features.  She has been tried on several different medications over the years, she goes into a partial remission, but stress comes along and triggers her falling back into the psychotic depression.

(Tr. at 413.)  Dr. Speare, the consultative examiner, opined that Plaintiff "cannot tolerate the pace and persistence of entry level work or interpersonal contact."  (Tr. at 23.)  Dr. LaKosky's opinion was entirely consistent with the opinion of the consultative examiner.

However, the ALJ concluded that there was "a paucity of findings to support [Plaintiff's]

41

allegations with regards to her mental impairments." (Tr. at 22.)  The ALJ further stated that he could "credit reports that [Plaintiff] is unable to do skilled employment but does not find that the severity of her reported symptoms are documented with regard to cognitive loss." (Tr. at 22.)  The ALJ noted that he "considered the assessment of . . . Dr. Speare, who opines that the claimant cannot tolerate the pace and persistence of entry level work or interpersonal contact" but did not "find this opinion consistent with [Dr. Speare's] evaluation" and concluded that he could "reasonably accept [Dr. Speare's] objective findings but disagree with his conclusions in light of alternative interpretation by the State Agency." (Tr. at 23.)

Only the state agency medical consultants disagree with the assessments of Dr. LaKosky and Dr. Speare.  The state agency medical consultants opined that Plaintiff was "able to do simple tasks include [sic] get along well with coworkers and supervisors and that she can adapt to changes." (Tr. at 23.)  However, the Eighth Circuit has noted that "[g]enerally, even if a consulting physician examines a claimant once, his or her opinion is not considered substantial evidence, especially if, as here, the treating physician contradicts the consulting physician's opinion." Lauer v. Apfel, 245 F.3d 700, 705 (8th Cir.2001).  Furthermore, the general rule is that the opinions of doctors who do not examine the plaintiff do not ordinarily constitute substantial evidence to support a finding of non-disability.  Nevland v. Apfel, 204 F.3d at 858 (8th Cir.2000).

As it stands, the ALJ's assessment of Plaintiff's mental RFC rests solely on the conclusions of the state agency consultants, and, as such, the Court concludes that the ALJ's assessment of Plaintiff's mental RFC is not supported by substantial evidence on the record as a whole.  The ALJ had the duty to fully and fairly develop the record, and the ALJ should have contacted Dr. LaKosky to obtain further information to fulfill his duty in the present case.

> **b.** **The ALJ did not make specific findings regarding Plaintiff's mental RFC.**

In the present case the ALJ stated that Plaintiff possessed the following RFC:

> [Plaintiff can perform] medium exertional work . . . defined as work lifting 50 pounds with frequent lifting or carrying of objects weighing up to 25 pounds, standing and/or walking 6 of 8 hours, and sitting 2 of 8 hours . . . This capacity is reduced by her inability to work near hazardous moving machinery or at unprotected heights.  She should not be required to use a power grip with her right hand and she should avoid vibrating hand tools due to her bilateral carpal tunnel syndrome.  Work is also restricted to an unskilled basis.

(Tr. at 25.)  The ALJ's sole finding regarding Plaintiff's mental RFC is that Plaintiff should be restricted to work of an unskilled nature.  This finding does not include an individualized assessment of Plaintiff's tolerance for stress.  Both Dr. Speare and Dr. LaKosky noted that Plaintiff's condition deteriorated in the face of stress; (see Tr. at 290; 394-96; 412) however, the ALJ does not address these findings in his mental RFC determination.  Simply restricting Plaintiff to unskilled work does not take into account Plaintiff's reaction to stress.  As stated in Social Security Ruling 85-15,

> Since mental illness is defined and characterized by maladaptive behavior, it is not unusual that the mentally impaired have difficulty accommodating to the demands of work and work-like settings.  Determining whether these individuals will be able to adapt to the demands or 'stress' of the workplace is often extremely difficult. . . . Individuals with mental disorders often adopt a highly restricted and/or inflexible lifestyle within which they appear to function well.  Good mental health services and care may enable chronic patients to function adequately in the community by lowering psychological pressures, [and] by medication . . . The reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances. . . . Because response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job.  A claimant's condition may make performance of an unskilled job as difficult as an objectively more demanding job. . . . Any impairment-related limitations created by an individual's response to demands of work, however, must be reflected in the RFC assessment.

SSR 85-15 *5-6.

43

In the present case, the ALJ did not address the opinions of both Dr. LaKosky and Dr. Speare regarding Plaintiff's reaction to stress and its effect on her mental impairments.  The ALJ merely stated that he "note[d] reports of difficulties tolerating stress and has considered this in reducing the estimate of the claimant's functioning."  (Tr. at 19-20.)  The way the ALJ "considered" the reports that Plaintiff had "difficulties tolerating stress" was to simply restrict Plaintiff to unskilled work; however, this restriction is not an appropriate mental RFC finding.  As noted in the Social Security Ruling, "the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demand of the job" and a person's "condition may make performance of an unskilled job as difficult as an objectively more demanding job."  SSR 85-15 *6.  As further noted by the Social Security Ruling, "[a]ny impairment-related limitations created by an individual's response to demands of work . . . must be reflected in the RFC assessment."  SSR 85-15*6.  In the present case the ALJ did not include Plaintiff's response to stress in his mental RFC assessment.

In addition, the ALJ also failed to address Plaintiff's frequent documented absences, which exceeded one day per week, from her previous work.  The ALJ did not determine whether these absences were "impairment-related limitations created by [Plaintiff's] . . . response to the demands of work."  SSR 85-15 *7.  Restricting Plaintiff to unskilled work did not take into account the frequent absences from employment that were caused by her impairments.  Therefore, the mental RFC finding made by the ALJ is not supported by substantial evidence on the record as a whole, and the ALJ did not make the specific findings necessary to convey an accurate hypothetical to the VE.

Therefore, the Court concludes that the ALJ's determination of Plaintiff's mental RFC was not supported by substantial evidence on the record as a whole.  The Court recommends that this case be remanded to the ALJ for further clarification from the medical source, Dr. LaKosky,

regarding his opinion of Plaintiff's mental ability to perform work related activities.  After Dr. LaKosky is given an opportunity to clarify his opinions regarding Plaintiff's mental ability to perform work-related activities, the ALJ should determine whether or not Dr. LaKosky's opinions as Plaintiff's treating psychiatrist are entitled to controlling weight or substantial weight. Furthermore, the ALJ should make specific findings regarding Plaintiff's mental RFC, including specific findings regarding the effect that workplace stress has on her mental impairments and the fact that her mental illness may cause her to be absent from work at least one day per week.  After the ALJ makes those determinations the ALJ will be in an appropriate position to determine Plaintiff's mental RFC, and should then forward the appropriate mental RFC to a VE to determine whether Plaintiff can perform other work that exists in significant numbers in the national or regional economy.

### 2.     The ALJ's physical RFC is supported by substantial evidence on the record as a whole.

The ALJ determined that Plaintiff has the physical RFC to perform "medium exertional work" which is defined as "work lifting 50 pounds with frequent lifting or carrying of objects weighing up to 25 pounds, standing and/or walking 6 of 8 hours, and sitting 2 of 8 hours."  (Tr. at 25) (citing 20 C.F.R. § 404.1567(c)).   The ALJ further concluded that Plaintiff's "capacity is reduced by her inability to work near hazardous moving machinery or at unprotected heights."  (Tr. at 25.)  The ALJ stated that Plaintiff "should not be required to use a power grip with her right hand and she should avoid vibrating hand tools due to her bilateral carpal tunnel syndrome."  (Tr. at 25.)

Plaintiff argues that this finding is in error because the ALJ failed to consider the opinion of the physical therapist who treated her after her right carpal tunnel surgery and also because the ALJ failed to include fibromyalgia as one of her impairments to be considered when determining her

45

RFC.  The Court has reviewed the evidence concerning the opinion of the physical therapist one month after her carpal tunnel surgery, and the Court notes that a physical therapist is not an acceptable medical source.  See 20 C.F.R. § 404.1513 (listing acceptable medical sources).  Dr. Hendricks, Plaintiff's treating physician, noted that Plaintiff was doing well two weeks after her surgery and that, with physical therapy, she should be near one hundred percent when she returned to see her in one month.  (Tr. at 305.)  Dr. Hendricks stated that Plaintiff suffered from minimal swelling and had full range of motion two weeks after her surgery.  (Tr. at 305.)  There are no subsequent physical examinations in the record suggesting that Plaintiff suffered from a continued impairment as a result of her carpal tunnel syndrome and Plaintiff reported that both carpal tunnel surgeries were successful.  Dr. Hendricks' opinion and the other evidence in the record are consistent with the physical RFC that the ALJ assigned to Plaintiff.

As for Plaintiff's claim that the ALJ failed to include fibromyalgia as one of her impairments, the Court recommends that Plaintiff's claim be rejected.  The treatment records for the relevant time period, that is, October 4, 2002, through the date of the ALJ's decision, do not document any additional limitations due to fibromyalgia.  Plaintiff did not mention any impairments related to fibromyalgia on the activities of daily living questionnaire that she completed on January 9, 2003.  (Tr. at 102-107.)  None of the physicians who treated Plaintiff stated that Plaintiff suffered from any functional limitations as a result of fibromyalgia during the relevant time period.

The ALJ was entitled to give weight to the July 2003 opinion of the state agency reviewing physician who opined that Plaintiff was capable of lifting 50 pounds occasionally, 25 pounds frequently, could stand and/or walk for a total of six hours in an eight hour day and sit for a total of six hours in an eight hour day.  (Tr. at 337-44.)  The state agency physician formed this opinion after

46

reviewing all of the evidence in the record, including the medical treatment records that mentioned

Plaintiff's carpal tunnel surgery and fibromyalgia.  After reviewing the medical record, the Court

concludes that there is substantial evidence on the record as a whole to support the ALJ's finding

that Plaintiff can perform the physical RFC noted above.

### 3. The ALJ's credibility determination is not supported by substantial evidence on the record as a whole.

As stated above, substantial evidence on the record as a whole means more than a mere

scintilla; it means "such relevant evidence as a reasonable mind might accept as adequate to support

a conclusion."  See Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison

Co., v. NLRB, 305 U.S. 197, 220 (1938).  "If an ALJ explicitly discredits a claimant's testimony

and gives good reason for doing so, [the Court] will normally defer to that judgment."  Dixon v.

Sullivan, 905 F.2d 237, 238 (8th Cir.1990).  Social Security Ruling 96-7p states:

> The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of . . . her claim, and in order to ensure a well-reasoned determination.

SSR 96-7p *4.  In the present case, the ALJ did not give specific reasons for discrediting Plaintiff's

testimony; therefore, the ALJ's credibility determination is not supported by substantial evidence

on the record as a whole.

The ALJ began his discussion of Plaintiff's credibility by reviewing Plaintiff's testimony that

she was accommodated by her employer when she was still working and that she was absent at least

one day per week from her previous employment due to her mental impairments.  (Tr. at 21.)  The

ALJ also noted that Plaintiff testified that she could no longer work because "her thoughts are not

clear enough or well-managed enough to be able to report to work regularly and to do the mental tasks required." (Tr. at 21.) The ALJ noted that he did not find that the objective medical record fully supported Plaintiff's allegations regarding the degree of severity of her impairments, and outlined what he believed were the "paucity of findings to support the claimant's allegations with regards to her mental impairments," as previously noted. The ALJ also noted that Plaintiff's "pattern of treatment and reports of symptoms are not persuasive of the degree of disability alleged," especially considering the fact that Plaintiff's medication was not significantly altered between September 18, 2002, when Dr. LaKosky determined that Plaintiff's condition had deteriorated to the point that he would support her claim for PERA disability, and July 21, 2003, the next medication review notes in the record. (Tr. at 22.) The ALJ also concluded that it was "clear from the claimant's reports of activities, confirmed by her husband and her testimony, that she is able to function in a wide variety of environments, situations, and tasks." (Tr. at 24.) The ALJ then noted that Plaintiff has an "impressive history of wages." (Tr. at 24.) However, the ALJ stated that

> this record does not indicate that the claimant has sought alternative occupational endeavors of a less stressful or complex nature. There is no empiric evidence of a failure at such work which would be more persuasive in showing that she is unable to perform any work that exists in significant numbers in the regional or national economy.

(Tr. at 24.) The Commissioner argues that "[s]uch a conclusion is a logical inference from Plaintiff's work history and, thus, the ALJ reasonably concluded that Plaintiff's work history detracted from her credibility rather than supporting it." (Def.'s Mem at 50.)

The fact that Plaintiff may have made a more persuasive case had she tried a less stressful job and been unable to complete it does not detract from Plaintiff's "impressive history of wages," and does not constitute a good reason for discrediting Plaintiff's testimony. (Tr. at 24.) Whether

48

or not Plaintiff attempted to perform a less stressful job upon determining that she could no longer perform her job as a social worker, a reasonable mind would not accept the fact that she failed to do so as adequate to support the conclusion that such failure actually causes her "impressive" work history to detract from her credibility rather than support it.

The ALJ also looked to Plaintiff's medication usage and determined that, because Plaintiff's medications remained unchanged, "[t]he clinical record does not fully support her subjective complaints as to a deteriorating or debilitating condition." (Tr. at 22.) The fact that Plaintiff's psychiatrist did not change her medications or increase her dosage of those medications does not lead a reasonable mind to accept the conclusion that Plaintiff's does not suffer from a deteriorating or debilitating condition.

Finally, the ALJ pointed to Plaintiff's activities of daily living as support for his claim that Plaintiff's subjective complaints are not fully credible. However, as noted in SSR 96-7p, an "individual's daily activities may be structured so as to minimize symptoms to a tolerable level or eliminate them entirely, avoiding . . . mental stressors that would exacerbate the symptoms. The individual may be living with the symptoms, seeing a medical source only as needed for periodic evaluation and renewal of medication." SSR 96-7p *8. Therefore, the fact that Plaintiff may be able to perform some activities of daily living does not necessarily diminish her subjective complaints that she is incapable of performing substantial gainful activity.

In the present case the ALJ's reasons for discrediting Plaintiff's testimony were not "sufficiently specific to make clear to . . . subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p *4. Therefore, the Court recommends that the ALJ review the record and determine Plaintiff's credibility, or lack thereof,

after the ALJ gives Dr. LaKosky an opportunity to clarify his opinions regarding Plaintiff's mental ability to perform work related activity, after the ALJ determines whether Dr. LaKosky's opinions as Plaintiff's treating psychiatrist are entitled to controlling or substantial weight, and after the ALJ makes specific findings regarding Plaintiff's mental RFC.

### 4.  The Record of the Hearing Is Sufficient

Plaintiff argues that the record of the hearing is insufficient because there are 26 notations in the transcript of the hearing where the tape recording of the testimony is "inaudible." However, the Court has reviewed the transcript of the hearing and has determined that it is sufficient. Insofar as Plaintiff's motion for summary judgment seeks to overturn the Commissioner's decision on this basis, the Court recommends that Plaintiff's motion be denied.

## V.  RECOMMENDATION

Based on the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.      Plaintiff's Motion for Remand for Consideration of New and Material Evidence [#16] be **DENIED**;

2.      Plaintiff's Motion for Summary Judgment [# 8] be **DENIED**;

3.      Defendant's Motion for Summary Judgment [# 12] be **DENIED**; and

4.      The case be **REMANDED** to the Commissioner of Social Security for further proceedings consistent with this Report and Recommendation.


DATED: November 27, 2006          s/ *Franklin L. Noel*
                                  FRANKLIN L. NOEL
                                  United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with

50

the Clerk of Court and serving on all parties, on or before **December 15, 2006**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.